All right, our next case is United States v. Titus No. 22-1516. And we'll hear from counsel. Would you like to reserve some time? Yes, Your Honor. I'd like to reserve three minutes for rebuttal. That'll be granted. All right. You may proceed. Thank you. Good morning. May it please the Court. Mary Kate Healy on behalf of Appellant Dr. Patrick Titus. This Court has focused oral argument on Dr. Titus's sentencing issue. Relevant conduct must be unlawful. And here the government failed to meet its burden by a preponderance of the evidence that Dr. Titus's relevant conduct involved at least 30,000 but not more than 90,000 kilograms of converted drug weight. And the District Court clearly erred by attributing that amount to him. And that amount, that error was significant. It increased Dr. Titus's guidelines range by over 100 months. This Court has asked whether estimation of drug While this Court has allowed extrapolation, and I'll refer to extrapolation and estimation somewhat interchangeably in the past, it's not appropriate in this case because unlike the cases involving extrapolation from a sample set, here the quantity attributable to Dr. Titus is ascertainable. It's known with precision. But what about McCutcheon? They had all these vials. That was a finite number as well, right? Yes, Your Honor. I think that in McCutcheon they had 119 vials and a chemist examined 15 out of the 119 in a procedure that other chemists within the Philadelphia Police Department also adopted. I think McCutcheon is distinguishable in a couple of ways on methodology. Here the District Court relied on Dr. Thomas' sample because that's what the government put forward. But I think you said that it was impossible to tell. And in that case, kind of like this case has, you've got that, I can't remember the acronym, but dealing with the prescriptions, you've got patient records. And in the McCutcheon case you had sort of a finite number of vials. Why couldn't that same analysis be employed here? Well, first in McCutcheon the vials contained cocaine base and distributing, selling cocaine base is always illegal. It's not always, it's not illegal to write a prescription for a controlled substance. I'm failing to understand what source of law constrains this. Look, there's a preponderance of the evidence standard. So you've got to get to 50.01%. And it's better the government is on sure ground if it brings all these things in. But as long as it persuades the district judge, it's more likely than not that there were at least 30,000 of these as a result of unlawful prescriptions. Isn't that the touchstone? What says if they can bring in more, they have to bring in more? What source of law? Anything in the guideline? I agree that this is a preponderance standard, but the preponderance standard is not toothless. It requires that the government put forward specific, reliable evidence for the district court to consider. All right. And so often it won't meet 50%. Okay? And you've got some good arguments about the particular way this district court did. But what says, as a matter of law, they always need to put in everything they have? Your Honor, I don't think that they necessarily need to put in everything that they have. But here they were seeking the highest base offense level. They were trying to hold Dr. Titus accountable for over 90,000 kilograms of converted drug weight. And I think that starting point really skewed the analysis because the parties agree that if you consider the patients underlying the counts of the indictment and the additional 24 patients that Dr. Thomas reviewed, 18 for whom he concluded the medical prescribing was illegitimate, that total for those 38 patients was 7,500 kilograms of converted drug weight. So to go from 7,500 kilograms to 90,000 kilograms is a significant enhancement, and the government needed to present specific and reliable evidence to support that conclusion. I've got that. But you're not making a Kikimoto-type argument that with the big enhancement we need clear and convincing evidence. This is all under the preponderance of the evidence standard, right? It is, Your Honor. And to revisit Chief Judge Chigars' point about McCutcheon, in McCutcheon they tested 15 vials and every single vial contained cocaine base. They also arrested the defendant in McCutcheon while he was actively distributing. So he was selling, you know, 19 vials with him. Here, everybody agrees that Dr. Titus's prescribing was not always beyond the scope of medical practice. The jury acquitted Dr. Titus on count 7, prescribing to GS, and the government's own expert reviewed 24 random samples and determined that Dr. Titus's prescribing couldn't be said to be illegal for 6 out of the 24. So those are defining facts that make the extrapolation a little bit more difficult here. I'll also note that in McCutcheon you had 15 of 119 samples, about 10%, whereas what Dr. Thomas reviewed was 38 files out of a patient universe of approximately 1,000. So you're pointing a calculation issue that if more analysis had been done, then it would have been okay? Because you're complaining, as I understand, you're complaining about the gap between 7,500 and 30,000. If it gets to 12, is that good enough? Does it have to be closer to 20? What's the number that we're supposed to be looking for here, or is it not a matter of calculation error? I think that what we advocated was that the district court should have looked at each patient to determine whether the course of prescribing to that patient exceeded the scope of medical, was not for a legitimate medical purpose. Why is that? And echoing Judge Phoebus, that certainly would give a sounder basis, perhaps one that actually goes beyond a preponderance. But why isn't this good enough? And if it's not good enough, then what is good enough? I don't think that the court necessarily needs to determine that a district court needs to look at every prescription or even adopt what the defense's position was, which was that the district court needed to look at every patient. But this isn't good enough because the methodology of the district court is unclear. It basically says 106,000 kilograms of converted drug weight is the government's position. 7,500 kilograms of converted drug weight is the defense position. And I think it falls somewhere between 30,000 to 90,000 kilograms. And that's not a precise measure. That's not a reliable way to determine the This court asked about the relevance of decisions on estimation and extrapolation to this analysis. And I think you can look to those decisions to see what type of, for lack of a better word, showing your work is appropriate to reach the determination that is going to be attributable to a defendant. But to your point, in those cases, you're always dealing with a substance that's illegal under any circumstances. So the extrapolation and aggregation that I thought I understood you to argue is coming from the fact that if you have one, and there's circumstantial evidence of more of the same than we can extrapolate for. But your point here was, we have one, we have a whole bunch of other stuff, but we don't know what that is. So it's not extrapolation. It's entirely conjecture as to what this other stuff is. But now I hear you saying, well, no, you might be able to use that at some point, but I don't know what the test is that we're supposed to apply. I don't think that this is a new test. I think that the district court, I do agree that this is not a case where the quantity of drugs is in dispute. The quantity of prescribed drugs is ascertainable via the Prescription Monitoring Program data. The question really is what amount of drugs was prescribed outside the usual course of professional practice and not for a legitimate medical purpose. And the government relied on Dr. Thomas' review of a sample that everybody, the government, the defense, and the district court all agree is not statistically valid. While McCutcheon doesn't require a statistician's expert, if that's the manner that the government is choosing to prove a quantity, it needs to be reliable. And it's not reliable to look at only 38 patients, 14 of which were selected for the indictment, and 24 additional ones that were selected randomly, and then extrapolating from that number out to 1,000-plus patients in the patient universe to determine illegality. And so are you, I mean, just so we can be clear, are you contending that representative sampling could not be used in this case, period? Or maybe it can never be used in this type of case, a, you know, pill mill type case? Your Honor, I think that the approach put forward, which we requested that the district court look at every patient and make a determination about the prescribing to that patient, I think that that approach allows for some estimation. Because, you know, Dr. Thomas in his direct examination talked about listening to a patient, understanding what the patient is telling you through the course of a treatment program, and that at a certain point, if the patient isn't testing positive for the drugs that you're prescribing, or is testing positive for drugs that you're not prescribing, the patient is telling you something. So Dr. Thomas, the government's own expert, contemplated that there would come a point in a patient's care where Dr. Titus should have stopped prescribing. And that range allows for estimation, that a district court could look at this patient and say, well, the prescribing might have been okay up to this point, but after three failed drug tests, Dr. Titus exceeded the scope of medical practice. I don't, so I think our approach allows for some estimation. It just requires that a district court review a patient. And that's the approach that the Seventh Circuit has taken in Rosenberg, and before that, in Chube 2. So you can extrapolate from the evidence that was put in at trial, the patients that were prescribed then, but you can't go to other patients that were never part of the conviction? Your Honor, I think that the district court, or the government under relevant conduct, could have looked at other patients outside of the people, the patients underlying the Councilman indictment, but they needed to prove that those prescriptions were unlawful. And I don't think that the PMP data that Mr. Patron reviewed during his statistical review, can approximate unlawfulness, because he explicitly said that he didn't make medical findings. He was just offering opinions about the amount of time, the number of drugs prescribed, or the highest days that drugs were prescribed over Dr. Titus' practice. It wasn't a medical determination. And so there were sort of two sample sets here, each with their own problems, but the district court ultimately looking at the numbers presented by the defense and the government, and choosing 30,000 to 90,000 as somewhere in between, I think is insufficient. It doesn't have a reliable way for this court to review, or to understand how they reached the number that they did. I noticed that you pointed out general trial evidence is kind of weak sauce, as they say. Correct. And that gets back to the point that this is a significant enhancement, and the government had the resource, it went through a trial, and could have put forward evidence about specific patients, or perhaps specific practices that would have allowed the district court to say, to make a more finite determination. And you see that in Diaz, for example, where the district court had to get from a 15-gram agreed upon quantity to the lower threshold for the guidelines of 20 grams, and the district court said, well, everyone agrees there's one transaction of 15 grams, two co-defendants testify, I see my time is up, may I finish? Sure. Two co-defendants testified about two transactions total, that would each be about 15 grams, and then there were evidence about five other instances. So you could trace how the district court went from 15 grams to the ultimately attributable quantity. Thank you, counsel. We'll hear from your adversary. Good morning, and may it please the court, John Alex Romano on behalf of the United States. The district court made a reasonable and conservative estimate of drug quantity based on all the trial evidence showing that Titus engaged in a rampant practice. Not a terribly robust showing, though. That's the reason why we're here. Your Honor, I think here, and the district court didn't simply rely on the analysis of the 24 random patient files. That, if you look at the, I know the court is familiar with the record, that's sort of the starting point of the court's drug quantity analysis. But it made a finding based on all the trial evidence, you know, it sat through trials and titled for a while, and it did make a finding on page 2336 of the appendix that there was widespread illegal prescribing, ignoring the positive drug tests. And the evidence certainly presented at trial supported the district court's reasonable and conservative estimate here. From widespread to 30,000, right? I mean, that's, let's suppose there's no error in that general conclusion. The question we're, I think, struggling with is what does the guideline mean when it says at least 30,000, but not more than 90,000? So, maybe go back a bit. What is it that allows this aggregation and extrapolation concept at all, whether it's a fully illegal case or a prescription case under 2D1.1? I think there are three primary reasons why estimating drug quantity is appropriate in prescription cases. I mean, in any case, let's deal with the end. The first would be the commentary to guideline section 2D1.1. But let's leave that aside, because whatever viability that ever had in terms of modifying the text of the guideline, I think the Supreme Court and our court has now made clear we can't change the meaning of the guideline with the commentary. So, let's move to number two. I think it would be that estimating drug quantity fully accords with what we ask district courts to do at sentencing. With its traditional fact-finding role, it makes all manner of factual determinations in calculating the defendant's advisory guidelines range, which is just one factor it considers in imposing a sentence within the statutory range triggered by the jury's verdict. And some of the factual determinations we entrust district courts with making relate to sort of what the outer bounds of the course of criminal conduct was in the case, as, for example, when a court is making a relevant conduct determination under 1B1.3A2. This is just by way of example. It's making a finding as to whether or not certain conduct is part of a common scheme or plan involving the offense of conviction. So we entrust district courts to make those factual determinations under it by a preponderance of the evidence. Sure. But that factual determination of what constitutes relevant conduct looks to circumstances and context and the general evidence. This is a number. This is saying 30,000, right? And it doesn't say the amount of narcotics that may have been involved in the scheme or the relevant narcotics that were part of the criminal conduct. It says 30,000. So your argument is you can circumstantially find by a preponderance of the evidence that there was 30,000 as a matter of the guidelines calculation and then import that over into the 3553 context. That's true. And one reason why that's appropriate is, you know, we allow juries to consider circumstantial evidence of unlawful prescribing when they're rendering a verdict, and they have to find guilt beyond a reasonable doubt. So a district court is perpetually capable of making a determination as to what quantity of prescription drugs were unlawfully prescribed, including under the court's standard, the Supreme Court's, you know, standard in Ruan. We certainly aren't saying you always need a statistician, but here we have a very large pool, we have a very small sample, shouldn't we get some kind of statistical briefing or expert at the district court to tell us, you know, what fraction of the total sample do you need with, you know, 18 out of 24, like the ratio of 75 percent or something, such that we can have 50.1 percent confidence that you can generalize to the total pool was at least 30,000 out of. And I think, in response to your question, I begin by saying there was other statistical evidence that was presented, which my counterpart alluded to. It didn't go to the medical legitimacy of the prescription. So let's, you know, we could talk about whether the sampling was right, we could talk about the statistical evidence on the first point, but you would also need statistical evidence on the medical legitimacy point, since you're trying to extrapolate. Right. But here I think the court, what the district court did is it looked at all the other evidence that this was not a legitimate medical clinic, and we have to bear in mind that the jury here found that Defendant Titus, on count 15, that he maintained his clinic for the purpose of unlawfully prescribing opioids, and in rendering that verdict, it found that unlawful drug activity was a significant or important purpose of operating those premises. So you have that jury determination, and so now allowing a district court to consider all the other evidence of unlawful prescribing, not limited to just the analysis of the 24  Well, you need to have statistical evidence for that, under that theory. I'm sorry? Why couldn't you just say, we found that there was one prescription, the jury, you know, we produced evidence that the jury found beyond a reasonable doubt shows there was one illegal prescription. We're good. Now the district court can consider circumstantially everything else, including the drug-involved premises, including the number of years of practice, testimony about how that patient was hurt, and say from that, we ask that you find, by preponderance of evidence, that there was 90,000 kilograms. Now I understand maybe that's a bad trial strategy, but you could do that, right, under your argument. Correct, Your Honor. I don't think there's a principle that would preclude a district court from doing it. I think it becomes harder for the government to meet its burden, and it becomes harder for the district court, if it's just going to extrapolate from one unlawful prescription to go up to 90,000 kilograms of converted drug weight. There's nothing in your logic that prevents that, because your argument is the guideline doesn't require you to actually show 30,000. It just has to show evidence by a preponderance that it could have been 30,000, and at that point, it's fine. Well, I think the court here found that it was confident that, you know, in light of all the trial evidence, that it was at a minimum 30,000 kilograms of converted drug weight. And that just, you know, that reduced the 75 percent ratio that to the, I want to attribute that to the random sample of 24 patient files, that reduces that 75 percent ratio to a percentage of about 29 percent. So, you know, in light of all of the trial evidence showing that Titus operated his clinic as, you know, for the purpose of issuing unlawful prescriptions, we submit that was a reasonable and a conservative estimate of drug quantity. Now, requiring a district court to go prescription by prescription or even patient by patient in a large scale case like this is not only unnecessary in light of the court's traditional … It could be unwieldy as well. Exactly. And if the court considers … I'm sorry. Shouldn't we at least require the district court to make some specific findings that like it considered that possibility, which is the best course, and then, you know, this would have taken months of agent time or weeks of court time or something like that before just skipping ahead because it's at least preferable to get the actual stuff looked at. So, what do we have in the record that shows the district court was careful enough … It's preferable? I'm curious. In a large scale case like this, Your Honor, it would be very difficult to do and require district court to do it. Well, certainly, does it make the government's proof stronger if we show prescription by prescription that it was unlawful? I would agree that it makes for stronger evidence, but here you have, just looking at the relevant time period that corresponds to the jury's verdict on count 15, which is about a 14-month period, you have prescriptions for controlled substances that were issued to 935 patients. Most of those were prescribed Schedule II, and there might have been some Schedule IV controlled substances in that figure. Requiring a district court to go, even if it's not prescription by prescription, but patient by patient, would be an incredibly onerous and difficult exercise … Well, it would be difficult for the government, I assume. I mean, district court would just be weighing whatever evidence you put in, but I assume your argument is it would be very difficult for the Justice Department to have to prove all of this other conduct that we want to now show as a sentencing enhancement better to simply extrapolate beyond the patient sample size we had into the 20,000 patients that are out there. I don't know that it would be more difficult. It would be more time-consuming. I would agree with Your Honor on that, and the government isn't trying to skirt its responsibility here, but the district court also has to consider the evidence. It has to go through all the evidence that the government presents, and the government has to go patient by patient, and the district court has to go patient by patient and make those determinations. And, you know, in some ways, this is even more onerous than what happened in McCutcheon, where I think you had 115 vials, and the estimates were about 15 of those 115. Here you have approximately 900 patients just in this relevant time period alone. Given the evidence that we allow juries to consider relating to unlawful prescribing that's not limited just to the testimony by an expert. But you don't need to get somewhere close to statistical, I mean, it doesn't really pass the straight-face test, does it, going with such a small sample size? Well, Your Honor, it's important. Isn't there something statistically significant? That and that sample size were buttressed by other statistical evidence, which is in the PSR, for example. If the court looks at paragraph 87, that sort of summarizes some of the testimony given by the certified fraud examiner at trial, Michael Petron. And he did an analysis of, it ended up being 282 random patient files. And he looked at it, one perspective was from, to do an analysis of how many inconsistent drug test results were in those files. 234 of those 282 patient files had one or more inconsistent drug test results. So a test that I was positive for an illicit drug, or positive for a non-prescribed drug, or that was negative for the prescription that Titus had written to the patient. And for a total of, I think, over 870 aberrant drug test results in those 234 patient files. And then after those drug tests were returned, those files show that Titus writes prescriptions for more than 7,000, writes more than 7,000 prescriptions to those 234 patients. So that buttresses the, you know, the extrapolation that's being done from the analysis of the 24 patient files. Because it shows that, yes, you know, in this set of 282 random patient files, there's prescribing that's being done in the face of inconsistent drug test results. And that's another. But that same evidence, then, obviously shows that some of these prescriptions were not illegal, right? And shouldn't we, what do we make of that? Your Honor, I think the district court, in finding that it was very confident in light of all the evidence that was presented at trial that it sat through, that at a minimum, seven or eight out of, just to stick with the 24 number, that seven or eight out of those 24 patients received unlawful prescriptions. Which is all you need to get to that 30,000 kilogram number. And, my apologies, Your Honor. But we do want to be sure that all this sampling is proper. And when it comes to Dr. Thomas, his sample is 2012 to 2014. But the PSR is focusing on, you know, just over a year. And late November 2013 to December 2014. So how do we know we're not, how do we know this is a random sample? How do we know we're not comparing apples and oranges here? Perhaps the prescribing behavior changed over time. I don't think the evidence at trial showed that it did change. But the burden's on you to show that it didn't change. Because you've got the burden of showing the quantity. And I think our trial evidence established that. Because the 2012 to 2014 corresponds to the period after Titus's medical license was reinstated. And he's subject to this consent agreement. And what the trial evidence showed is that, you know, he was going through some of the procedures that he was required to do under the consent agreement. But it was just for show. As, for example, when he would issue random pill counts to patients. But they weren't random because the patients got advance notice of when they had to come in for the pill count. So that defeated the entire purpose of doing the pill count. So our presentation, our argument has been that, you know, it's the same scheme from 2012, after his license is reinstated, to when the clinic shuts down in December of 2014. So I don't think there would be a ground, in our view, to... All right. Well, your friend on the other side can comment if she thinks there's something to disagree about in the record. Judge Meade has a few questions. Can we, counsel, I never gave you a chance to finish your explanation. I think you were explaining why aggregation and extrapolation is appropriate at all. And I think the first answer was the guidelines commentary. I think the second was the burden on the court. The court's traditional fact-finding rule at sentencing to find facts. And you said there was a third. The third, and we've discussed some of it, is just that this court's case law in non-prescription cases governing sort of the standards governing fact-finding are sufficient both to guide and constrain a district court's estimation of drug quantity. It's obviously... You're talking about McCutcheon and the fully illegal cases? Not only the sampling cases, but also what this court has said, for example, in Paulino and Diaz, that a district court cannot engage in speculation or guesswork. And I would submit that when you look at the court's comments at sentencing, it had some of those standards in mind because it made a conservative finding that, and it was very confident based on all the evidence, that only at a minimum the 30,000 figure was reached. It said, could I have gone higher? It's possible, but I'm just going to say that at least 30,000 kilograms was proven here, and that's all I need because of this wide range that corresponds to a base offense level of 36. The guidelines use numeric calculations for all sorts of enhancements, right? Where else do we typically see this kind of extrapolation going into the base guideline calculation? Offhand, Your Honor, I can't recall. My first thought was loss under the fraud guideline, but that's obviously an enhancement. As to a base offense level, I apologize. I can't think of anything. No, I can't think of anything either, right? And the curiosity of this, at least from my read, is it seems as though this might all be being driven by the application note, right? The application note opens the door to saying, well, you know, if you can't find all of the drugs, then you might be able to aggregate the quantity, right? And that's what drives the results in things like McCutcheon, but now the government wants to use that reasoning and say, well, it works as well in prescription drug cases. And the differences, obviously, as you pointed out, are one, not all of the drugs are illegal. Two, there is at least direct evidence from which we could figure this out because we know who the patients are. We know what they were prescribed. There is no mystery that's out there. And so does it ultimately come back to what I think you, you know, helpfully characterized as the burden that would sit upon the Justice Department to have to prove up enough patients or prescriptions to get to that 30,000 threshold? I think that is a relevant consideration, yes, Your Honor, when you're dealing with a patient size this large. But our argument is also that a district court is equipped to do this by virtue of everything that it does at sentencing. And ultimately, the inquiry goes to determining an advisory guideline range, which the court considers as a factor. And of course, the obligation is on the district court to make an accurate finding. But we don't see a reason to constrain the type of evidence the court may consider or the methodology it uses in making a reasonable calculation of quantity here. If we find error, was it harmless? Your Honor, we have not made that argument because the sentence that was imposed, 240 months, the district court did grant a downward variance of about 52 months. But it's still higher than the range that Titus argued for. I think the top end of the range that he argued for was 235. So we are not making a harmless error argument. Great. Thank you. Thank you. Thank you, counsel. And we'll hear rebuttal. Thank you, Your Honors. First, I want to briefly address count 15. The government pointed out that the jury must have found that Dr. Titus maintained the Church Street location for a substantial or important reason to distribute outside the usual course of professional practice and not for a legitimate medical purpose. But substantial or important is not the same thing as all. And the jury found that he didn't prescribe all of his substances outside the usual course. The government's expert found that. And also, I just want to point out that Mr. Patron narrowed the universe that he reviewed from about 6,000 patients through the life of Dr. Titus's practice to patients that only received controlled substances. So Mr. Patron's analysis narrowed the universe from 6,000 to 1,000, which would further undercut the thought that substantial or important, that those findings could be extrapolated to the quantity attributable to Dr. Titus. The government has referenced a lot of the trial evidence that the district court did sit through, but that's not what the district court articulated when it was explaining why it was reaching 30,000 to 90,000 kilograms converted drug weight. And that burden is on the government. And so the district court didn't have the specific arguments that the government is now making here. It heard them, but it wasn't referencing the statistical evidence or the general trial evidence that the government is now relying on. And the government needed to put forth the specific evidence it was relying on to support its sentence. And it didn't do that here. I think one final distinction between some of the cases the government has cited in support- Well, can you respond to your adversary argued that, hey, it's just untenable. But to come up with this many people to be able to prove this just on an approach where it's sort of every single script or patient is considered, that just may not be possible. And it would take a lot of the court's time. How do you respond to that? I disagree that it would take a lot of the court's time. I allow that it might take more of the government's time. But I think that speaks to the burden and the nature that they saw at the highest base offense level applicable here. They asked for a sentence of 360 months to life. And if you're going to seek that higher enhancement, that enhanced base offense level, then you need to put forth evidence that is sufficient to support that. And this court has recognized that in United States v. Roman, which is a pre-Booker case, that when the government is seeking a substantial enhancement, they should put forward a quality of proof consistent with the consequences of those enhancements. And I finally would like to distinguish the two cases that the government has really relied on and both of those involved a district court finding that all of the prescriptions were outside the usual course of professional practice. And the district court explicitly did not make that finding here. He said that all was not an appropriate determination. Okay. Thank you. Thank you, Your Honors. We'll take the case under advisement. Thank counsel for their excellent briefing and arguments today. And we'd like to greet you at sidebar. Thank you.